UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

**JUDGE WOOD**

-------------------------------------------------------- **05**~~Index No.~~ **CV    7455**

JOHN ROULETT,

Plaintiff,          **COMPLAINT**

-- against --

AMERICAN CAPITAL ACCESS SERVICE          **DEMAND FOR JURY TRIAL**
CORPORATION and AMERICAN CAPITAL
ACCESS HOLDINGS LIMITED,

Defendants.

--------------------------------------------------------x



John Roulett, by and through his attorneys Lankler & Carragher, LLP, for his complaint

against defendants American Capital Access Service Corporation and American Capital Access

Holdings Limited alleges as follows:

**PARTIES**

1.      John Roulett ("Plaintiff" or "Mr. Roulett") is an individual residing at 6 Cedar

Place, Garden City, New York 11530.

2.      Defendant American Capital Access Service Corporation ("ACA" or the

"Company") was formed on or about December 1997. It is a corporation organized under the

laws of Wyoming and authorized to do business in New York, with its principal place of

business at 140 Broadway, New York, New York 10005. ACA is a wholly owned subsidiary of

American Capital Access Holdings Limited ("ACA Holdings"), which is organized under the

laws of Bermuda with its principal place of business at 140 Broadway, New York, New York

10005. ACA employs approximately 100 people in New York.

3.      ACA is engaged in the business of, *inter alia*, providing financial guaranty insurance and credit enhancement services, which including credit enhancement services for securities of companies that file reports under the Securities Exchange Act of 1934 (the "1934 Act").

4.      Mr. Roulett was improperly terminated by ACA on or about January 20, 2004 in violation of the Americans with Disabilities Act of 1990, 42 U.S.C. § 12101, *et seq.* (the "ADA"), the Age Discrimination in Employment Act, 29 U.S.C. § 623, *et seq.* (the "ADEA") the New York State Executive Law § 296 (the "Executive Law") with respect to claims of discrimination based upon age and mental and physical disabilities, and Section 806 (the so-called "Whistleblower Provisions") of the Corporate and Criminal Fraud Accountability Act of 2002, Title VII of the Sarbanes-Oxley Act of 2002 (the "Sarbanes-Oxley Act" or the "Act"), 18 U.S.C. § 1514A.

## JURISDICTION AND VENUE

5.      The Court has jurisdiction over this lawsuit pursuant to 28 U.S.C. § 1331, 29 U.S.C. § 626, 42 U.S.C. § 12117, 18 U.S.C. § 1514A, and has supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a).

6.      Venue is proper under 28 U.S.C. § 1391(b) because defendants reside in this judicial district and/or a substantial part of the events or omissions giving rise to the claim occurred in this judicial district.

2

## PROCEDURAL HISTORY

7.     Mr. Roulett commenced an administrative action alleging causes of action under the ADA, ADEA and the New York Executive Law with respect to age discrimination and discrimination based upon his physical and mental disabilities by filing a complaint with the Equal Employment Opportunity Commission ("EEOC") on November 15, 2004.

8.     By letter dated May 26, 2005 and received by Mr. Roulett on May 31, 2005, the EEOC issued a determination with respect to its investigation of Mr. Roulett's claims and provided Mr. Roulett with a Notice of Right to Sue in connection with his claims.

9.     Mr. Roulett commenced a separate administrative action with respect to his claims under the Whistleblower Provisions of the Sarbanes-Oxley Act by filing a complaint on May 12, 2004, within the 90-day limitations period from the date Mr. Roulett became aware of his claim, with the Department of Labor, Occupational Safety and Health Administration (the "Department").

10.     The Department dismissed the Complaint by letter dated August 17, 2004. Mr. Roulett appealed the dismissal by letter dated September 15, 2004.

11.     Thereafter, the Department granted the appeal and scheduled a hearing. Prior to the hearing, defendants herein moved to dismiss the complaint. Mr. Roulett opposed the motion and cross-moved for leave to amend his complaint to include an additional cause of action that was reasonably within the scope of the original complaint.

12.     On December 22, 2004, the Administrative Law Judge granted defendants' motion to dismiss and denied Mr. Roulett's cross-motion to amend his complaint, as set forth in her Order Denying Motion to Amend Complaint and Decision and Order Dismissing the Complaint (the "Order") of that date.

3

13.     By letter dated January 7, 2005, Mr. Roulett filed a Petition for Review with the Administrative Review Board seeking review of the Order wherein he took exception to each and every finding, conclusion and order set forth in the Order.

14.     By notice dated January 12, 2005, the Administrative Review Board issued a Notice of Appeal and Order Establishing Briefing Schedule on Mr. Roulett's appeal of the Order of the Administrative Law Judge. The appeal was fully briefed and submitted for consideration on April 8, 2005.

15.     By Notice dated July 19, 2005, Mr. Roulett sent a Notice advising the Administrative Review Board of his intention to file an action in federal court inasmuch as more than 180 days have passed since he submitted his Complaint to the Department and there has not yet been a final determination of his claims.

## FACTS

16.     Mr. Roulett was employed by ACA beginning on or about May 29, 1999.

17.     Prior to his employment with ACA, Mr. Roulett had 15 years of experience in the securities markets specializing in the areas of institutional sales and municipal bond products. Among other positions, he was employed in the high yield municipal bond department at Lehman Brothers for 11 years and managed institutional sales groups at two firms. At all relevant times he held NASD Series 7 and Series 63 licenses.

18.     Mr. Roulett was an employee of ACA for almost 5 years, until he was summarily terminated with no notice or warning on or about January 20, 2004.

19.     Mr. Roulett was hired by ACA in May 1999 as an Associate in Sales and Marketing in the New York office; he advanced in the Company and his role was enlarged and

4

enhanced as his abilities and knowledge of the markets became known and appreciated by the Company. In late 2000, he joined the Secondary Department, and in July 2002 he was promoted to Director and Manager of Municipal Secondary Market Group.

20.     During the time that Mr. Roulett was employed at ACA, he regularly met his performance goals and the Company has acknowledged, and it is undisputed, that:

   a. he had a thorough understanding of the market in which he was operating;

   b. he effectively worked to improve the products the Company offered to that market;

   c. he had a strong understanding of the needs of the Company's clients in that market;

   d. he worked assiduously to identify opportunities for the Company in those markets; and

   e. his work was profitable for the Company.

21.     In addition, while Mr. Roulett was at ACA, he effected a turnaround in both the reputation and the performance of the Municipal Secondary Markets credits within the Company and increased the profitability of those credits, which previously were considered within the Company to be less safe than the primary credits because of the Company's prior history in writing those credits.

22.     Mr. Roulett made numerous other contributions to the Company during his tenure there. Mr. Roulett created the Premium Impact Calculator, still utilized by the Company, which provides a methodology to calculate the premiums to insure different municipal bonds and provides vital information to other segments of the Company regarding the impact of the premium on the value of the bond. He also devised a model that enabled the Company to establish a baseline for the performance of the bond insurance issued by the Company.

23.     Among his other contributions, Mr. Roulett developed tools to disseminate information internally for the use of other employees and externally for the development of new

5

business, some of which are still utilized by the Company. and created a daily compendium of information from outside sources which was relied upon by the analysts, management and the then CEO of the Company, to whom Mr. Roulett personally emailed the information each day.

24.     Mr. Roulett also utilized his broad contacts in the industry for the benefit of ACA. As one example, Mr. Roulett introduced a company to ACA, with which he had a longstanding relationship; in 2003, that company became ACA's biggest revenue-generating client for its Primary Municipal Markets department.

25.     The Company consistently acknowledged that Mr. Roulett met or exceeded the Company's expectations of his performance through its regular written reviews concerning his business and financial responsibilities at the Company and that he met or exceeded his performance goals including with respect to the profitability of the credits that he had written.

26.     For example, in his performance review dated February 5, 2002 for the 2001 fiscal year (the "2001 Review"), Mr. Roulett received an excellent performance rating with an overall determination that he "exceeds expectations" as an employee. This review was consistent with his prior reviews at the Company.

27.     In his 2001 Review, the Company acknowledged Mr. Roulett's value to the Company. The reviewer commented, among other things, that "John brings a strong element of creativity and original thought to his work. He frequently volunteers useful suggestions for improving work. His innovative approaches and ideas have produced *excellent results*." (emphasis supplied)

28.     The 2001 Review also noted that Mr. Roulett is "highly skilled at synthesizing complex and diverse information" and that "he is very knowledgeable of the market and competition." In sum, the Review concluded:

6

> John continues to make significant contributions to the
> organization through his solid performance. *His most notable*
> *achievements were exceeding budgeted revenues and providing the*
> *marketplace with timely trading value information which*
> *contributed to rebuilding ACA's credibility with market*
> *participants.*

(emphasis supplied).

29.     Mr. Roulett's review the following year (the "2002 Review") also recognized his

benefit to the Company:

> John is very focused on generating premium revenue and this year
> *he successfully met his premium targets.* Transactions in the
> secondary market were also of a high quality and had better
> returns. *The secondary market area met the strategic goals of the*
> *municipal department.*

(2002 Review at 2) (emphasis supplied).


**Circumstances of Termination**

30.     On January 20, 2004, Mr. Roulett was summarily terminated by the Company.

On that date, Mr. Roulett was in the process of closing a transaction on behalf of the Company.

He also had multiple other transactions that were under consideration by the Company and were

in the process of being reviewed.

31.     Nonetheless, with no warning or notice, and despite his continuous satisfactory

performance of the business and financial responsibilities of his position, Steve Schrager,

Managing Director of National Sales and the Secondary Market Department, informed Mr.

Roulett that he was being terminated effective immediately.

32.     The Company did not send Mr. Roulett a termination letter identifying the reason

for his termination.

7

33.     Shortly after his termination by the Company, Mr. Roulett contacted Michael

Satz, the Company's Chief Executive Officer, and the members of the Senior Executive

Committee of the Company (Steve Schrager, Rubin Selles, William Tomljanovic, Maryam

Muessel, and Ted Gilpin) to learn the reason for his sudden, unexpected termination. Despite his

efforts, the Company did not inform Mr. Roulett of the reason(s) he was terminated.

34.     Mr. Roulett did not have a performance review prior to his termination, never

received a warning letter regarding his performance and did not have an exit interview to inform

him of the reason for his termination. Moreover, during the time that he was employed at the

Company, he was never told either in writing or verbally, that he needed to improve his job

performance; nor was Mr. Roulett ever subject to any disciplinary action while employed by

ACA.

35.     Following his termination, ACA sent Mr. Roulett a "General Release" dated

January 20, 2004 (the "Release") and required that he sign it in order to receive severance

benefits. The Release required Mr. Roulett to waive any and all claims that he may have against

the Company including claims of employment discrimination on the basis of age and disability,

claims under the ADA, claims under the ADEA, claims under the New York State Human

Rights Law, and claims under the Act, among other claims.

36.     The Release purported to offer Mr. Roulett 45 days within which to consider

whether to waive his rights under these provisions.

37.     The severance package offered to Mr. Roulett at the time of his termination was a

modest lump sum payment and the continuation of his medical and dental insurance for 6 months

or until he was employed and eligible to receive such insurance, whichever was earlier.

However, as he learned for the first time in approximately the third week of September 2004, his

8

proposed severance package was not comparable to packages offered to other employees and the Company had discriminated against him in the terms of his proposed severance package. Other employees who were terminated by the Company, even employees who were in positions subordinate to his, were offered substantially greater severance packages than he was. Among other things, those employees received 4 weeks of salary for each year that they had been employed by the Company. If Mr. Roulett had been offered that same benefit, he would have received substantially greater monies than those proposed in the Release.

38.     The other employees also were compensated for their unexercised options, whereas Mr. Roulett received no compensation for his unexercised options. In fact, following his termination the Company did not provide Mr. Roulett with *any* information regarding his options, including how many he held, what they were worth, what his exercise rights were or when they were triggered; nor did they give him the opportunity to exercise his options should he have chosen to do so.

39.     In addition, the other employees were not summarily terminated as Mr. Roulett had been but were given a notice period of several weeks prior to termination.

40.     Furthermore, Mr. Roulett was not offered or given his year-end bonus for 2003, even though he had worked the full year and, as with most jobs in his industry, the year-end bonus is an integral and expected portion of an employee's annual compensation.

41.     Mr. Roulett did not sign the Release.

**Mr. Roulett Was Terminated Because of His Age**

42.     At the time of his termination, Mr. Roulett was 46 years old.

43.     Upon information and belief, the Company replaced Mr. Roulett with a person in his early 30s, approximately 15 years younger than Mr. Roulett.  Furthermore, the person who replaced Mr. Roulett did not have the job qualifications required to perform the job, and resigned shortly thereafter.

44.     In addition, other senior managers were terminated at or about the time of Mr. Roulett's termination.  Each of those managers was over 40 years old.

## Mr. Roulett Was Terminated Because of His Disabilities

45.     In December 2003, approximately one month before he was terminated, Mr. Roulett informed his supervisor, Steve Schrager, Managing Director of National Sales and the Secondary Market Department, and William Haberthur, Director of Human Resources, that he has a heart condition.

46.     Mr. Roulett also informed Mr. Schrager that he also has high cholesterol and borderline high blood pressure and that he was being prescribed medications to address his conditions and was put on a program of diet and exercise.

47.     Mr. Roulett also suffers from bipolar disorder, a mental disability, and depression. Mr. Roulett had been diagnosed with this mental disability before or at about the time he began working at ACA.

48.     The Company knew about Mr. Roulett's mental disability.  Among other things:

   a. Mr. Schrager observed in Mr. Roulett's desk, which was not locked and was accessible to anyone in the office, certain medications that were prescribed for his condition, including Xanax;

b.   In or about September 2003, when Mr. Roulett sent some of his personal belongings to his home from the Company's mailroom, Mr. Schrager and Mr. Haberthur compelled the mailroom personnel to open Mr. Roulett's personal boxes and then reviewed the contents of those boxes, which included the medications that Mr. Roulett takes to treat his bipolar disorder and depression; and

c.   Mr. Roulett filled the medications that were prescribed for his mental disability through the prescription plan offered by the Company.

49.   In fact, on multiple occasions Mr. Schrager made comments to Mr. Roulett indicating that he knew that Mr. Roulett was taking medications for his mental disability. Among other comments, Mr. Schrager said to Mr. Roulett on numerous occasions: "Take one of your pills to relax," or "Maybe you should take your anxiety pill."

50.   Mr. Roulett knew that the Company had previously terminated an employee, who was a subordinate of Mr. Roulett's and reported to him, because of his mental and physical disabilities.

51.   Despite Mr. Roulett's cardiac condition and mental disability, Mr. Roulett was able to and did perform his essential job functions at a level that met or exceeded expectations throughout his tenure at the Company.

**Mr. Roulett Was Terminated for His Whistleblowing Activities**

52.   ACA primarily provides the following services in the financial marketplace: (1) it provides financial guaranty and other insurance products in connection with credit enhancement of municipal obligations; (2) it originates, structures and manages collateralized debt obligations

11

which are comprised of portfolios of investment grade corporate credits or asset-backed securities; and (3) it provides "customized solutions" in the form of insurance products and structured credit derivatives for financial institutions, corporations and financial intermediaries in the insurance and structured finance markets.

53.     Registered companies are among ACA's clients for which it provides financial guaranty, insurance, credit enhancement and customized solutions services. When ACA provides these services, it does so as an agent or contractor for these registered companies. The services provided by ACA to its registered company clients significantly affect the ability of registered companies to dispose of securitized assets and issue debt securities and the valuation of those registered companies in the marketplace.

54.     ACA's actions impact the value of the registered companies by, *inter alia*, (1) providing insurance products or credit enhancement for their debt securities, which enhances the ability of the registered companies to sell their debt securities in the marketplace; and (2) providing monitoring and collateral review services for the collateralized debt obligations of registered companies, which affects the creditworthiness of those obligations and the ability of the registered company to sell them. Thus, false statements about ACA are also false statements about every registered company ACA services.

55.     As a result of his knowledge of the securities and municipal markets in which the Company operates, Mr. Roulett became aware that the Company was engaging in certain improper activities in the insurance and financial markets in which it participates. Because of ACA's failure to disclose these activities, the description of the services and the credit rating of ACA's credit enhancements for securities of registered issuers were misstated to the investing public.

56.     Mr. Roulett felt duty bound to bring these serious violations to the Company's

attention and did so on several occasions. The Company knew that Mr. Roulett had engaged in

protected activity under Section 806 of the Corporate and Criminal Fraud Accountability Act of

2002, Title VII of the Sarbanes-Oxley Act of 2002 (the "Sarbanes-Oxley Act" or the "Act")

since he had informed officers and/or directors at the Company of activities that he believed

were illegal and improper.

57.     Among other things, in mid-2003, Mr. Roulett informed his supervisor, Mr.

Schrager, who was the Managing Director of National Sales and the Secondary Market

Department, of the following activities that he believed were illegal and improper:

   a.  He informed Mr. Schrager that the Company was improperly using Surveillance
       Analysts as underwriters for Secondarily Insured deals thus requiring them to review
       the same credits that they underwrote, which is a clear breach of the firewall required
       between the two areas of the Company and a violation of the requirement that
       Surveillance Analysts be independent and separate from the underwriting process so
       that they can render an unbiased opinion as to whether a credit is continuing to
       operate at the required level of performance;

   b.  He informed Mr. Schrager that the Company had compounded this illegality by
       imposing a quota on the Surveillance Analysts regarding the amount of revenue they
       were expected to generate, thus improperly linking their compensation to their
       underwriting activities;

   c.  He informed Mr. Schrager that the Company was acting improperly in pressuring the
       Surveillance Analysts to change their opinions on certain failing credits that should be
       or had been listed on the "Watch List," a list of poorly performing credits that informs
       an investor of potential defaulting credits the Company may have to cover and is
       relied upon by external buyers as a measure of past performance of the Company
       management, so that the list would not be so large as to scare potential investors; and

   d.  He informed Mr. Schrager that pressuring the Surveillance Analysts to change the
       status of the Company's credits illegally deceives investors and the public regarding
       the level of risk attendant to investment in the Company and ACA-booked
       obligations, including obligations of registered companies, and are actionable
       misrepresentations.

58.     In addition, he advised the Company of activities that he believed were violations

in connection with its bond activities in the Secondary Market.  Specifically, beginning in late

2001 and repeatedly thereafter, he informed Duong Vo, Director and Manager of the

Surveillance Department, as well as Mr. Schrager that he believed the following activities of the

Company were improper and/or illegal:

    a.  He informed Mr. Vo and Mr. Schrager that the Company's method of calculating the
       average life of a bond is improper when applied to the partial amounts of the bonds
       underwritten by the Company in the secondary market; and

    b.  He informed Mr. Vo and Mr. Schrager that by doing so the Company was distorting
       the final maturity for secondarily insured policies in order to shorten the average life
       of exposure and the risk of the bonds insured in the Secondary Market, thereby
       artificially embellishing the Profit Index on the policies as well as the value of the
       Company's credit enhancement products and services including those rendered to
       registered companies.

59.     Mr. Roulett complained about these departures from standard industry due

diligence practices at the very time that registered issuers that employed the services and

financial guaranty products of ACA for their debt securities were representing to rating agencies,

institutional and individual investors, as well as in filings made with the SEC, that these very

procedures were strictly followed.

60.     Although Mr. Roulett brought these improprieties to the attention of the Company

on multiple occasions, the Company did not change its methodologies in any respect.

61.     Rather than modify its practices to cease its improper and illegal behavior and

impose the necessary remedies to ensure compliance with the controlling regulations and

standards, the Company terminated Mr. Roulett.

62.     Mr. Roulett was summarily terminated with no warning or notice.  A mere 3 ½

weeks later ACA Holdings filed its first submission with the SEC in pursuit of an IPO.

**ACA's Pattern of Terminations and Resignations**

63.      On February 13, 2004, ACA Holdings filed its Form S-1 Registration Statement under the Securities Act of 1933, thereby commencing its attempt to raise capital by offering shares for sale to the public.  ACA was required to raise capital at this time in order to satisfy rating agency capital adequacy requirements for the businesses engaged in by ACA.  ACA Holdings' Form S-1 was amended on March 15, 2004 and again on April 8, 2004.

64.      Just as the Company was preparing its IPO, during the time period of January through May 2004, there was a pattern of terminations and/or resignations of key personnel at the Company.  These terminations and resignations appeared designed to eliminate personnel with a detailed knowledge of the fundamental workings of the Company in anticipation of and preparation for the IPO.

65.      Prior to the preliminary IPO filings, the controller of the Company, Fabio Pieroni, who had intimate knowledge of the Company's day-to-day financial matters, left the employ of the Company.

66.      In April and May 2004, key senior management of the Company who were instrumental in the Company's development and expansion into new business arenas, and whose experience and expertise was relied upon by the Company in seeking to sell securities in the public markets, announced that they were resigning from the Company.  On or about April 30, 2004, Chief Operating Officer, Maryam Muessel, announced that she was resigning from the Company.  Thereafter, on or about May 6, 2004, Chief Executive Officer and deputy chairman, Michael Satz, announced his resignation, allegedly for "personal" reasons.

67.    Viewed in the context of these events, it is apparent that Mr. Roulett's termination was an attempt to eliminate him as a whistleblower regarding the Company's compliance with financial and regulatory requirements so that neither the Company nor the registered companies which used its credit and collateral enhancement services would be hampered in their attempts to raise capital through the sale of securities to the public. This was because once the Company commenced the process of going public and thus was obligated to comply with the enhanced requirements of the Act, it would be bound by the Act's rules regarding corporate responsibility, including attending to employee complaints of improper activities at the Company and conforming to the enhanced financial disclosure requirements of the Act.

68.    It was not until Mr. Roulett became aware of the IPO and the pattern of terminations and resignations at the Company that he came to know that his whistleblowing activities were the cause of or a contributing factor in his termination by the Company.

## AS AND FOR A FIRST CAUSE OF ACTION

69.    Plaintiff repeats and realleges the allegations of paragraphs 1 through 68 of the Complaint as if fully set forth herein.

70.    Mr. Roulett was 46 years old at the time of his termination and is a member of a protected age group.

71.    At the time that Mr. Roulett was terminated, he was performing his essential job functions at a level that met or exceeded his employer's expectations.

72.    Mr. Roulett was replaced by a younger employee who was, upon information and belief, in his early 30s. Moreover, Mr. Roulett's replacement did not have the experience

required for the position of Director and Manager of Municipal Secondary Market Group, and resigned shortly thereafter.

73.    Mr. Roulett's termination, as well as the proposed severance package offered to him upon termination, was an unlawful discrimination based upon his age.

74.    Accordingly, defendants have violated the ADEA and the Executive Law.

75.    On November 15, 2004, Mr. Roulett filed a Complaint with the EEOC setting forth his allegations of age discrimination. By letter dated May 26, 2005 and received by Mr. Roulett on May 31, 2005, the EEOC informed Mr. Roulett of its determination and issued a Notice of Right to Sue.

76.    As a result of defendants' illegal actions, Mr. Roulett has been damaged in an amount to be determined.

## AS AND FOR A SECOND CAUSE OF ACTION

77.    Plaintiff repeats and realleges the allegations of paragraphs 1 through 76 of the Complaint as if fully set forth herein.

78.    In addition to Mr. Roulett, other senior level employees of ACA were terminated at or about the time that Mr. Roulett was summarily terminated by the Company.

79.    A disproportionate number of the senior level employees who were terminated by the Company are members of a protected age group.

80.    Defendants' policies and procedures, resulting in terminations of senior level employees of ACA, have had a disparate impact upon the members of a protected age group, including Mr. Roulett.

81.     Mr. Roulett's termination, as well as the proposed severance package offered to him upon termination, pursuant to defendants' policies and procedures, was an unlawful discrimination based upon his age.

82.     Accordingly, defendants have violated the ADEA and the Executive Law.

83.     On November 15, 2004, Mr. Roulett filed a Complaint with the EEOC setting forth his allegations of age discrimination based upon disparate impact upon the members of a protected age group. By letter dated May 26, 2005 and received by Mr. Roulett on May 31, 2005, the EEOC informed Mr. Roulett of its determination and issued a Notice of Right to Sue.

84.     As a result of defendants' illegal actions, Mr. Roulett has been damaged in an amount to be determined.


### AS AND FOR A THIRD CAUSE OF ACTION

85.     Plaintiff repeats and realleges the allegations of paragraphs 1 through 84 of the Complaint as if fully set forth herein.

86.     Mr. Roulett has a physical disability in the form of a cardiac condition, with high cholesterol and borderline high blood pressure.

87.     ACA was informed of Mr. Roulett's physical disability and of the program that had been prescribed to treat his disability including medication, diet and exercise.

88.     Mr. Roulett was qualified to perform his essential job responsibilities in full.

89.     Mr. Roulett was, in fact, performing his essential job responsibilities at a level that met or exceeded his employer's expectations.

90.     Mr. Roulett's termination, as well as the proposed severance package offered to him upon termination, was an unlawful discrimination based upon his physical disabilities.

18

91.     Accordingly, defendants have violated the ADA and the Executive Law.

92.     On November 15, 2004, Mr. Roulett filed a Complaint with the EEOC setting forth his allegations of discrimination on the basis of his physical disabilities. By letter dated May 26, 2005 and received by Mr. Roulett on May 31, 2005, the EEOC informed Mr. Roulett of its determination and issued a Notice of Right to Sue.

93.     As a result of defendants' illegal actions, Mr. Roulett has been damaged in an amount to be determined.

## AS AND FOR A FOURTH CAUSE OF ACTION

94.     Plaintiff repeats and realleges the allegations of paragraphs 1 through 93 of the Complaint as if fully set forth herein.

95.     Mr. Roulett has a mental disability in the form of bipolar disorder.

96.     Upon information and belief, ACA was aware of Mr. Roulett's mental disability and of the fact that he was prescribed medication to treat his disability.

97.     Mr. Roulett was qualified to perform his essential job responsibilities in full.

98.     Mr. Roulett was, in fact, performing his essential job responsibilities at a level that met or exceeded his employer's expectations.

99.     Mr. Roulett's termination, as well as the proposed severance package offered to him upon termination, was an unlawful discrimination based upon his mental disability.

100.    Accordingly, defendants have violated the ADA and the Executive Law.

101.    On November 15, 2004, Mr. Roulett filed a Complaint with the EEOC setting forth his allegations of discrimination on the basis of his mental disabilities. By letter dated May

26, 2005 and received by Mr. Roulett on May 31, 2005, the EEOC informed Mr. Roulett of its determination and issued a Notice of Right to Sue.

102.    As a result of defendants' illegal actions, Mr. Roulett has been damaged in an amount to be determined.

## AS AND FOR A FIFTH CAUSE OF ACTION

103.    Plaintiff repeats and realleges the allegations of paragraphs 1 through 102 of the Complaint as if fully set forth herein.

104.    ACA is a covered company under the Sarbanes-Oxley Act since it acts as an agent and/or contractor of registered companies in the marketplace for which it provides financial guaranty, insurance, credit enhancement and customized solutions services; thus false statements about ACA are also false statements about the securities of every registered company ACA services.

105.    Mr. Roulett was engaged in protected activity under the Sarbanes-Oxley Act when he informed the Company that it was acting in violation of rules and regulations in the insurance and financial markets in which it operates and that the Company's public statements that it followed those rules were false.

106.    The Company knew that Mr. Roulett had engaged in protected activity under the Sarbanes-Oxley Act, inasmuch as he had informed officers and/or directors at the Company of the illegal and improper activities at issue.

107.    Mr. Roulett was terminated solely for engaging in the protected activity and/or his protected activity was a contributing factor in his termination.

108.    Mr. Roulett was, in fact, performing his essential job responsibilities at a level that met or exceeded his employer's expectations.

109.    Mr. Roulett's termination, as well as the proposed severance package offered to him upon termination, was an unlawful discrimination based upon his engaging in protected activity under the Sarbanes-Oxley Act.

110.    Accordingly, defendants have violated the Sarbanes-Oxley Act.

111.    Mr. Roulett commenced an administrative action with respect to his claims under the whistleblower provisions of the Sarbanes-Oxley Act by filing a complaint with the Department of Labor, Occupational Safety and Health Administration (the "Department"), on May 12, 2004, within the limitations period of the Act running from the date the Company and ACA Holdings commenced their efforts to launch an initial public offering and Mr. Roulett first became aware that he was terminated because he engaged in protected activity under the Act.

112.    Defendants herein moved to dismiss the complaint. Mr. Roulett opposed the motion and cross-moved for leave to amend his complaint to include an additional cause of action that was reasonably within the scope of the original complaint.

113.    On December 22, 2004, the Administrative Law Judge granted defendants' motion to dismiss and denied Mr. Roulett's cross-motion to amend his complaint, as set forth in her Order Denying Motion to Amend Complaint and Decision and Order Dismissing the Complaint (the "Order") of that date.

114.    As set forth above, Mr. Roulett appealed the Order of the Administrative Law Judge. The appeal was fully briefed and submitted for consideration on April 8, 2005.

115.    By letter dated July 19, 2005, Mr. Roulett sent a Notice advising the Administrative Review Board of his intention to file an action in federal court inasmuch as more

than 180 days have passed since he submitted his Complaint to the Department and there has not

yet been a final determination of his claims.

116.    As a result of defendants' illegal actions, Mr. Roulett has been damaged in an

amount to be determined.


WHEREFORE, Plaintiff John Roulett requests that the Court issue an order finding that

defendants:

> (a)    violated the Age Discrimination in Employment Act and New York
> Executive Law § 296 and awarding Mr. Roulett reinstatement, back pay,
> front pay, and all other benefits to which he would be entitled including
> but not limited to 401K contributions with the Company's matching
> contributions, health, dental and other insurances provided by the
> Company, and all other damages to which he is entitled under the statutes;

> (b)    violated the Americans with Disabilities Act of 1990 and New York
> Executive Law § 296 on the grounds that they discriminated against Mr.
> Roulett because of his physical disabilities and awarding Mr. Roulett
> reinstatement, back pay, front pay, and all other benefits to which he
> would be entitled including but not limited to 401K contributions with the
> Company's matching contributions, health, dental and other insurances
> provided by the Company, and all other damages to which he is entitled
> under the statutes;

> (c)    violated the Americans with Disabilities Act of 1990 and New York
> Executive Law § 296 on the grounds that they discriminated against Mr.
> Roulett because of his mental disabilities and awarding Mr. Roulett
> reinstatement, back pay, front pay, and all other benefits to which he
> would be entitled including but not limited to 401K contributions with the
> Company's matching contributions, health, dental and other insurances
> provided by the Company, and all other damages to which he is entitled
> under the statutes;

> (d)    violated the whistleblower provisions of the Sarbanes-Oxley Act on the
> grounds that defendants discriminated against Mr. Roulett because he
> engaged in protected activity under the Act and awarding Mr. Roulett
> reinstatement, back pay, front pay, and all other benefits to which he
> would be entitled including but not limited to 401K contributions with the
> Company's matching contributions, health, dental and other insurances
> provided by the Company, and all other damages to which he is entitled
> under the Act;

(d)     awarding punitive damages for defendants' intentional and illegal discrimination against Mr. Roulett;

(e)     awarding Mr. Roulett the expenses of this action including but not limited to attorneys' fees, costs and disbursements; and

(f)     granting such other, further and different relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

PLEASE TAKE NOTICE that Plaintiff John Roulett demands a trial by jury pursuant to

Rule 38(b) of the Federal Rules of Civil Procedure of all issues triable of right by a jury.

Dated: New York, New York
       August 23, 2005

LANKLER & CARRAGHER, LLP

By: _____
        Andrew M. Lankler (AL 1202)
        Idelle R. Abrams (IA 4760)
        Attorneys for Plaintiff
        John Roulett
        845 Third Avenue, 17th Floor
        New York, New York 10022
        (212) 812-8910